UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08-10310-RGS

REV-LYN CONTRACTING COMPANY

v.

PATRIOT MARINE, LLC, ROBERT J. LOCKYER, and
HUGH FARRELL

FINDINGS OF FACT, RULINGS OF LAW, AND
ORDER FOLLOWING A TRIAL WITHOUT JURY

December 9, 2010

STEARNS, D.J.

This case was tried before the court without a jury on June 14, 2010. At the

conclusion of the evidence, the parties sought and were granted leave to file proposed

findings of fact and conclusions of law. By agreement, these were due on August 6, 2010.

Because of the untimely death of defendants' attorney, Norman Peloquin, the filing date

was extended to October 5, 2010.

Based on the credible testimony, the exhibits admitted in evidence, and the

stipulations of the parties, I make the following findings and rulings.

FINDINGS OF FACT

1.    Plaintiff Rev-Lyn Contracting Company (Rev-Lyn), is a Massachusetts

corporation. Rev-Lyn owned the Ralph B, an undocumented coastal deck barge, and a

70-ton Manitowoc crawler crane, Model 2900, Serial No. 29616 (Crane). The Ralph B was

used by Rev-Lyn to transport the Crane and provide it with a sea-based work platform.[1]

_____

[1]The Crane was not a fixture of the Ralph B, but was a sea-land vehicle that could
be operated from a single fixed base or on two retractable crawler treads, the one if by

Rev-Lyn also owned the Big Toot, a documented coastal towing vessel (tug) bearing Official No. 517294. The Big Toot served as the escort tug for the Ralph B.

2. Defendant Patriot Marine, LLC, is a Massachusetts limited liability company engaged in general marine work. Defendants Robert Lockyer and Hugh Farrell are the principals and managers of Patriot Marine.

3. On February 1, 2006, Rev-Lyn entered into a Bare Vessel Charter Agreement (Charter Agreement) with Patriot Marine for the hire of the Ralph B and the Crane.

4. Pursuant to section 12 of the Charter Agreement, Patriot Marine agreed to "maintain the Vessel [Ralph B] in the same condition as at delivery, make all repairs necessary to keep the Vessel in the same condition at delivery and assumes all risk of damage or loss, ordinary wear and tear excepted and agrees to re-deliver the Vessel and articles of inventory attached thereto . . . in substantially the same condition as when accepted by Charterer."

5. Pursuant to section 15 of the Charter Agreement, Patriot Marine agreed that "should the Vessel [Ralph B] sustain breakdown of machinery or be disabled or damaged by fire, grounding, collision or other cause after delivery, and that the cause of such breakdown of machinery or damage or other cause is deemed to be a result of Charterer's negligence, [Charterer will] continue payments of charter hire as aforesaid until such time as the Vessel is restored to the condition as at the commencement of the Charter."

6. In section 29 of the Charter Agreement, Rev-Lyn determined the fair market value of the Crane for insurance purposes to be $70,000. The Charter Agreement was a

sea, or the two if by land.

form leasing agreement prepared by Rev-Lyn for charters of the Ralph B and of its other vessels and equipment. Tr. at 61, 109.[2]

7. Although Patriot Marine had signed a Charter Agreement when hiring the Big Toot a year earlier on March 16, 2005, the terms of the 2005 Agreement expired on April 12, 2005. Patriot Marine did not take possession of the Big Toot again until April 12, 2006.

8. No other written agreement governed the hiring of the Big Toot on April 12, 2006.[3]

9. On April 12, 2006, Patriot Marine deployed the Ralph B, the Crane, and the Big Toot in an effort to salvage a sunken cabin cruiser near the location of Rev-Lyn's yard. During the salvage operation, the Crane's boom collapsed, causing serious damage to the boom, wire rope, and front rollers, and less serious damage to the Big Toot's pilothouse, port side window, port side running light, and deck illumination light. The accident caused no material damage to the Ralph B.

10. Patriot Marine stipulated at trial to contractual liability under the Charter Agreement for the damage to the Crane, as well as to liability in tort for the damage to the Big Toot.

---

[2]All transcript references are to the official record of the June 14, 2010 trial.

[3]According to the evidence at trial, Rev-Lyn and Patriot Marine had an informal relationship under which Patriot Marine had access to Rev-Lyn's yard and equipment. On the morning of the accident, Hugh Farrell, one of the principals of Patriot Marine, "borrowed" the Ralph B and the Crane with the oral permission of Rosemary Kelley, Rev-Lyn's owner. Patriot Marine stipulated at trial that it was subject to liability under the law of bailment for the damage to the Big Toot. Tr. at 28.

11.  The Crane was bought by Rev-Lyn in 2001 for $65,000.  At the time of the purchase, the Crane required extensive repairs.  During the five years prior to April 12, 2006, Rev-Lyn had purchased $69,000 in parts to refurbish the Crane.

12.  As required by section 13 of the Charter Agreement, Patriot Marine insured the Crane for $70,000 through Fireman's Fund naming itself and Rev-Lyn as the co-insureds.  In November of 2006, Rev-Lyn received a payment of $62,000 from Fireman's Fund to pay for damage to the Crane.  On October 3, 2007, Patriot Marine tendered Rev-Lyn a check for an additional $8,000 as a "final payment" for the "sale" of the Crane to Patriot Marine.[4]  Rev-Lyn refused to deposit the check.  Patriot Marine did not make any additional payments to Rev-Lyn for damage to the Crane or the Big Toot.

13.  Rev-Lyn sold the Ralph B to Patriot Marine shortly after the April 12, 2006 accident in "as is" condition.

14.  Rev-Lyn sold the Crane in its damaged condition to Norwalk Marine in June of 2008 for $25,000.  Rev-Lyn undertook no repairs of the Crane prior to its sale.  Although the evidence at trial did not establish a precise dollar amount, the parties agree that the cost of repairing the Crane would have exceeded its fair market value.  Verified Compl. ¶ 13; Tr. at 46-47.

15.  The Charter Agreement required Patriot Marine to pay Rev-Lyn a $13,000 monthly fee  for the hire of the Ralph B and the Crane, plus 1% per month interest on any rental amount unpaid.

---

[4]Robert Lockyer, the General Manager of Patriot Marine, testified that in tendering the check he expected Patriot Marine to take ownership of the Crane's salvage value.

16.  Patriot Marine has not paid Rev-Lyn for the hire of the Ralph B or the Crane. Patriot Marine made the monthly payment for the hire of the Big Toot.

17.  At the time of the accident involving the Big Toot and the Crane, Rev-Lyn was under contract to perform maintenance work for Distrigas.  The Distrigas job required the use of both a tug and a crane.  After the accident, Rev-Lyn rented a substitute barge and crane to complete the job, incurring rental costs in July, August, and October of 2006, totalling $32,364.96.  Rev-Lynn also paid a $700 captain's fee for the pickup and return of the replacement barge and crane.

18.  In July, August, and October of 2006, Rev-Lyn rented a tug to perform work on the Distrigas project in place of the Big Toot.  Rev-Lyn paid $1,250 for the rental of the substitute tug in July of 2006 and an additional $23,500 in rental fees in October and November of 2006.  Rev-Lyn did not undertake any repairs to the Big Toot other than to fix the running light.

19.  There is no evidence that at that time of the accident, Rev-Lyn was performing any contract requiring the use of a crane other than the Distrigas job.

20.  The Charter Agreement provided that "should it become necessary for either party to enforce its rights under the terms of this Agreement, the losing party agrees to make the damaged party whole and to pay reasonable attorney's fees and costs to the prevailing party."  Rev-Lyn incurred $46,017.50 in attorney's fees in prosecuting this litigation.  Blaisdell Aff.

21. Following the April 12, 2006 accident, the Big Toot was capable of navigating in fair weather, although it was unable to operate safely at night or in bad weather in its unrepaired condition.  Tr. at 96.

21. Rev-Lyn sold the Big Toot to a third party in "as is" condition in October of 2008 for $26,500.

## RULINGS OF LAW AND ULTIMATE CONCLUSIONS OF FACT

1. This court has jurisdiction over admiralty and maritime claims pursuant to 28 U.S.C. §1333 and Rule 9(h) of the Federal Rules of Civil Procedure.

2. Venue lies in the District of Massachusetts.  28 U.S.C. § 1391(b).

3. The Ralph B was sold to Patriot Marine immediately after the April 12, 2006 accident.  Rev-Lyn is therefore not entitled to damages for loss of the use of the Ralph B.

4. Patriot Marine is liable to Rev-Lyn for the damage to the Crane incurred in the April 12, 2006 accident.

5. In general maritime law, "a constructive total loss occurs when the cost of repairing the ship [or other maritime property] is greater than its fair market value immediately before the casualty." DiMillo v. Sheepscot Pilots, Inc., 870 F.2d 746, 751 (1st Cir. 1989) (citations omitted).  The Crane by this definition was a total loss.

6. Where a vessel is a total loss, the measure of damages is its fair market value at the time of the loss plus interest (less any salvage value).  Standard Oil Co. of New Jersey v. S. Pac. Co., 268 U.S. 146, 155-156 (1925). See also A & S Transp. Co., Inc. v. Tug Fajardo, 688 F.2d 1, 2 (1st Cir. 1982).

7. The vessel owner has the burden of establishing the fair market value of the vessel. Oliver J. Olson & Co. v. Am. S.S. Marine Leopard, 356 F.2d 728, 733 (9th Cir. 1966).

8. Market value "is established by contemporaneous sales of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market . . . . " Id., quoting Standard Oil, 268 U.S. at 155-156.

9. Evidence of value other than contemporary sales can be used only when it is shown that a vessel's market value cannot be reasonably established. Oliver J. Olson, 356 F.2d at 733 & n.1.

10. Based on the evidence introduced at trial, I find that the $70,000 estimate of the fair market value of the Crane immediately prior to the accident offered by defendant's marine surveyor, Michael Collyer, more credible than the estimate of $125,000 given by plaintiff's surveyor, Michael Lombardi. The Lombardi estimate is not based on comparable sales, but on Internet listing prices. I credit Michael Collyer's testimony that he investigated each of the Internet listings cited by Lombardi and determined that in each instance the listed cranes had either not been sold or had been sold only after significant reductions in the asking prices. Tr. at 98.

11. I credit Michael Collyer's $70,000 estimate of the fair market of the Crane because it is based on comparable and contemporaneous market sales of the same Manitowoc model 2900 crane. According to Collyer, the comparable cranes sold at prices

ranging from $20,000 to $60,000.[5]  I also give weight to the fact that Rev-Lyn in drafting the Charter Agreement assigned an insured value to the Crane of $70,000.  See In re Offshore Carrier & Liner Serv., Inc., 82 B.R. 504, 506 (Bankr. E.D. Mo. 1988)  (In agreeing on a valuation of a vessel and naming the owner as a co-insured, "the intent [of the parties] is to pay the vessel owner an amount not greater than the agreed value where there has been an agreement as to value between the owner and the charterer.  The fair market value of the vessel is irrelevant.").  See also Tidewater Marine Activities, Inc. v. Am. Towing Co., 437 F.2d 124, 129-130 (5th Cir. 1970) ("[T]his value is corroborated by the independent negotiations between plaintiff and Berry Bros. regarding the charter of the barge, when the parties stipulated to an agreed value of $22,000.00 for insurance purposes.").

12.  Under general maritime law, where a vessel is a total loss, damages for "[l]oss of use [or lost profits] is not allowable."  A & S Transp., 688 F.2d at 2, relying on the rule of The Umbria, 166 U.S. 404 (1897).  There is an exception, however, under The Umbria with respect to the benefits of a voyage in fieri.  Id. at 421-422, citing The Amiable Nancy, 3 Wheat. 546, 560 (1818).

---

[5]Collyer testified that "[t]here's an axiom in the industry, a general rule of thumb on older cranes such as this 2900, that a certified crane is generally worth about $1,000 per ton of ability to pick up weight.  So a 70-ton crane would be about $70,000."  Tr. at 100.

13. As Rev-Lyn was performing the Distrigas job at the time of the contract, it is entitled to recover the costs of renting the needed replacement barge and crane. The total sum expended by Rev-Lyn for the substitute barge and crane was $33,064.79.[6]

14. Although no written agreement covered the hire of the Big Toot, Patriot Marine is liable to Rev-Lyn under the law of bailment for the damage to the Big Toot. Tr. at 94. A bailment arises out of a contractual relationship, express or implied, and upon delivery and acceptance of the bailed property, the bailee assumes a duty of care to the bailor. King v. Trustees of Boston Univ., 420 Mass. 52, 59-60 (1995). A bailee is liable in damages to the bailor if his negligence causes damage to the bailed property. See Sarkesian v. Cedric Chase Photographic Labs., 324 Mass. 620, 622 (1949). Under maritime law, the cost of restoring a damaged vessel to a seaworthy condition is an accepted measure of damages. Pinto v. M/S Fernwood, 507 F.2d 1327, 1331 (1st Cir. 1974).

15. A fair estimate of the cost of repairing the damage to the Big Toot as a result of the April 12, 2006 accident is $9,000. I base this finding on the report of Dana Collyer, Fireman Fund's marine surveyor, and on the testimony of Rosemary Kelley, the owner of Rev-Lyn, who agreed at trial with Collyer's estimate. Tr. at 24.

16. "If the plaintiff chooses not to . . . make repairs[,] . . . damages are therefore to be measured [solely] 'by the estimated cost of repairs at a time immediately following the

---

[6]I am also influenced by the fact that despite the Charter Agreement's stipulation of the insured value of the Crane as $70,000, and Fireman's Fund's immediate access to its surveyor, Dana Collyer, it delayed tendering the $62,000 insurance payment for damage to the Crane to Rev-Lyn until November of 2006, after the Distrigas job was completed.

accident.'" Indep. Bulk Transp. Co. v. Morania Abalo, 676 F.2d 23, 26 (2d Cir. 1982), quoting United States v. Shipowners & Merchants Tugboat Co., 103 F. Supp. 152, 153 (N.D. Cal. 1952), aff'd, 205 F.2d 352 (9th Cir. 1953). Rev-Lyn is therefore entitled to recover $9,000 for the damage to the Big Toot.

17. Where a vessel is unnecessarily taken out of service, lost profits will be denied. Bouchard Transp. Co., Inc. v. Tug Ocean Prince, 691 F.2d 609, 612-613 (2d Cir. 1982). The evidence at trial established that the Big Toot suffered only minor damage as a result of the April 12, 2006 accident and could have remained in service with minor repairs. As Rev-Lyn unreasonably refused to undertake these repairs and restore the Big Toot to service, it may not recover the costs associated with the hiring of a replacement tug for the Distrigas work.

18. "The owner who claims lost profits or other damages has a duty to mitigate damages and minimize losses." Thomas J. Schoenbaum, Admiralty and Maritime Law §14-6 (4th ed. 2004). As Rev-Lyn did not discharge its duty in this regard, it is not entitled to recover any lost profits based on the anticipated service of the Big Toot prior to its sale in 2008.

19. Pursuant to section 3 of the Charter Agreement, Rev-Lyn is entitled to payment of the hire of the Ralph B and the Crane for the period from February 1 to April 12, 2006, at the pro-rated monthly rate of $13,000, for a total of $31,200.

20. Pursuant to section 17 of the Charter Agreement, Rev-Lyn is entitled to recover its reasonable attorney's fees and costs from Patriot Marine in the amount of $46,017.50.

21. The Verified Complaint alleges that "Defendants' failure to pay to Plaintiff the

accrued charter hire and the costs to repair or replace Plaintiff's vessels and equipment is continuing, and constitutes an unfair and deceptive trade practice within the meaning of M.G.L. c. 93A, §11." I deem Mass. Gen. Laws ch. 93A, § 11, inapplicable to this case, as it is preempted by substantive general maritime law.

22. Moreover, this is not a case in which I would impose multiple damages (even on the 1:1 basis proposed by Rev-Lyn). In general maritime actions, punitive damages are imposed only when a defendant's conduct is intentional or wanton and reckless amounting to a conscious disregard of the rights of others. See CEH, Inc. v. F/V Seafarer, 70 F.3d 694, 699 (1st Cir. 1995) (in admiralty, punitive damages are "rarely imposed"). Mere breaches of contract and negligent acts are not in any event the stuff of Chapter 93A claims (assuming that Chapter 93A applies). See Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 100-101 (1979); Darviris v. Petros, 442 Mass. 274, 278 (2004). Nor will a court impute a good faith disagreement over the amount of a sum owing to an impure motive. See Commercial Union Ins. Co. v. Boston Edison Co., 412 Mass. 545, 556-557 (1992).[7]

23. In maritime cases, "[t]he rate of prejudgment interest is that allowed by statute in the state where the court is located." Ralph Joseph v. J.P. Yachts, LLC, 436 F. Supp. 2d 254, 274 (D. Mass. 2006); 3A Benedict on Admiralty § 305 (2005). See also Taylor v. 42 Foot Edd Harbor Hull, 1994 WL 779759, at *15 (D. N. J. June 22, 1994). Under Massachusetts law, the applicable percentage rate is 12% per annum. See Mass. Gen.

---

[7]Testimony regarding a purported telephone threat attributed to defendant Robert Lockyer, that if Rosemary Kelley (the owner of Rev-Lyn) refused his settlement offer, he would "drag[ ] his feet and it would go through the court and she wouldn't get a dime," Tr. at 63-64, was stricken by the court.

Laws ch. 231, § 6H.  Patriot Marine's breach of contract and negligent acts occurred on April 12, 2006.  Rev-Lyn is entitled to 12% simple interest per annum from April 12, 2006, to the date of the entry of judgment.

24.  Postjudgment interest is assessed in accordance with 28 U.S.C. § 1961.  <u>New Bedford Marine Rescue, Inc. v. Cape Jeweler's, Inc.</u>, 240 F. Supp. 2d 101, 119 (D. Mass. 2003); <u>Clifford v. M/V Islander</u>, 882 F.2d 12, 13 (1st Cir. 1989).

ORDER

Judgment is granted to plaintiff Rev-Lyn in the following amounts: (1) $8,000 for the balance owing on the damage to the Crane; (2) $9,000 for the damage to the Big Toot; (3) $31,949 in unpaid charter payments for the Ralph B and the Crane (including the 1% per month interest charge); (3) $33,065 for the costs of hiring a replacement barge and crane for the Distrigas job; and (5) attorney's fees and costs in the amount of $46,018; (6) for a total of $103,032.[8]  Rev-Lyn is also entitled to prejudgment interest from April 12, 2006, to the date of the entry of judgment, at 12% per annum; and postjudgment interest thereafter at the federal rate to the date of the payment of the judgment.  The Clerk will enter final judgment and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

[8]I have deducted the $25,000 salvage value of the Crane from the total award.  <u>See</u> <u>DiMillo</u>, 870 F.2d at 752.

12